# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

UNITED STATES OF AMERICA

vs.  Case No. 6:12-cr-158-Orl-37TBS

MICHAEL VANGASBECK

## ORDER

This cause is before the Court on Defendant Michael Vangasbeck's Motion to Suppress Evidence (Doc. No. 39), filed August 20, 2012. The Government opposes the Motion. (Doc. No. 43.) The Court held a hearing on September 19, 2012, at which time the parties presented evidence and arguments relating to the Motion.

## FINDINGS OF FACT

The Court makes the following findings of fact, which include credibility determinations made after considering the evidence and listening to and observing the witnesses as they testified.

About a week prior to April 2, 2012, the FBI received a complaint that the Defendant had propositioned a ten-year-old girl who was visiting a home near the Defendant's residence in Debary, Florida. On the morning of April 2, 2012, two agents, Special Agent Rod Hyre and Agent Steve McElyea, arrived at the Defendant's residence with the intention of interviewing him. The agents did not obtain a warrant for the Defendant's arrest or to search the home prior to the interview. The agents were dressed in suits, and their firearms were not visible.

When the agents knocked on the door of the residence, the Defendant's mother, Sara Vangasbeck, answered. The agents introduced themselves, showed her their

credentials, and said that they were there to speak with the Defendant. The agents also indicated that they were not there to arrest the Defendant. Mrs. Vangasbeck told the agents he was asleep, invited the agents into the residence, and went to the Defendant's bedroom to wake him. She returned shortly thereafter and escorted the agents to the Defendant's bedroom.

During this time period, Mrs. Vangasbeck asked the agents if she could be present when they spoke to the Defendant. The agents demurred and told her that they would prefer to speak to the Defendant, who is a thirty-four-year-old man, alone. Mrs. Vangasbeck testified that she also told the agents that the Defendant was mentally ill. The agents, however, both testified that they did not recall her making that statement at that time.[1]

After escorting the agents to the Defendant's bedroom, Mrs. Vangasbeck went to a remote part of the residence to care for two small children.[2] The agents introduced themselves to the Defendant, and the bedroom door was closed. The bedroom was moderately sized and was furnished with a bed, a small desk with a computer, and a few additional pieces of furniture. The Defendant stood near the bed and the agents stood across the room from him near the door.

At the beginning of the interview, the agents informed the Defendant that he was not under arrest and that he did not need to speak with them. The Defendant asked if his mother could be present during the interview, to which the agents responded with

---

[1] The Court need not resolve this conflict in the evidence, as it is not necessary to do so to resolve the legal issue central to the Motion to Suppress.

[2] Mrs. Vangasbeck testified that, at one point, she interrupted the interview and asked again if she could be present. She testified that the agents told her again they would like to speak with the Defendant in private. She then left and waited in the living room.

2

the same answer they gave his mother. The agents asked the Defendant if he knew why they were there. Initially, the Defendant responded that he did not know. Thereafter, the agents asked the Defendant if he had pictures of naked little girls on his computer. The Defendant indicated that he did. The agents then asked the Defendant if they could search the computer in the room. The Defendant told the agents that they could search the computer. Agent McElyea then began searching the computer while Agent Hyre continued speaking with the Defendant. The Defendant was given a form entitled, "Consent to Search Computer(s)." He signed it. The completed form was admitted into evidence as Government's Exhibit number 1.

During the interview, the Defendant discussed with the agents why he viewed pornographic images of children, his preferences concerning such images, and how he had obtained certain pornographic and non-pornographic images of children. Also, without prompting, the Defendant directed the agents to certain folders on his computer that contained pornographic images of children.

The agents testified that, during the interview, the Defendant said that he had, in the past, heard voices. Agent Hyre asked the Defendant if he was schizophrenic. The Defendant said he was schizophrenic and that he was taking medications. Agent Hyre inquired about the voices, which the Defendant said he had last heard several months ago. The Defendant also told the agents that he was not hearing any voices at the time of the interview. The agents testified that they first became aware of the Defendant's mental illness when he told them during the interview that he heard voices previously. The agents also testified that they did not notice the Defendant fidgeting or trying to avoid eye contact more than they typically encounter when interviewing suspects. The agents testified that they thought the Defendant was cooperative, candid, and forthright

during the interview. The Court finds this testimony credible based on the agents' demeanor and recall of the events of the interview under direct and cross-examination.

Upon conclusion of the interview, the agents briefly spoke with Mrs. Vangasbeck and the Defendant's sister, who had arrived at the residence during the interview. Mrs. Vangasbeck told the agents that the Defendant was diagnosed with paranoid schizophrenia and that he was taking medications for that condition. The agents then left the residence. All of the witnesses who testified at the evidentiary hearing agreed that the entire interview from knock to departure was conducted in a non-confrontational and professional manner by the agents.

The Defendant was subsequently arrested and charged with one count of receiving material containing images of child pornography and two counts of knowingly possessing material containing images of child pornography. The Defendant made certain post-*Miranda* statements to the agents.

At the evidentiary hearing on Defendant's Motion to Suppress, Mrs. Vangasbeck's testimony provided more information concerning the Defendant's mental illness. The Defendant has exhibited symptoms from age thirteen. When he was about twenty-three or twenty-five years old, he was diagnosed by a psychiatrist as suffering from paranoid schizophrenia. He was prescribed, and still takes, several medications to treat his schizophrenia, depression, and anxiety. Mrs. Vangasbeck said that the Defendant had described hearing voices just days before the interview.

Mrs. Vangasbeck testified that the Defendant does not work and he collects disability benefits. She said that he must be reminded to brush his teeth, change his clothes, and bathe. He does not cook and acts "just like a little kid." She said that there are times when he cannot distinguish between dreams and thoughts, and his imagined

voices and real voices. She also testified that he is very eager to please adults and that he is very agreeable and non-confrontational.

Mrs. Vangasbeck testified further that the Defendant attended exceptional student education classes throughout elementary and high school. Although the Defendant completed twelfth grade, he did not receive a high school diploma because he did not pass the high school competency test. The Defendant did receive a certificate of completion and did, for a short time, attend classes toward obtaining a general education diploma. Mrs. Vangasbeck testified that he writes "equivalent to a first grader." Also, Mrs. Vangasbeck testified that a lot of people "recognize that something is strange" about the Defendant.[3]

## ANALYSIS

The Defendant moves to suppress the images found by the agents as well as the statements he made during the interview and post-arrest. The Defendant contends that it should have been reasonably apparent to an objectively reasonable law enforcement officer that the Defendant lacked the ability to voluntarily consent to the search of his computer, given his mental illness and the duress placed upon him by being interviewed by two federal agents in a closed room without his mother being present.

The Government disagrees and argues that there is sufficient evidence for the Court to find that consent was freely and voluntarily given in this case. The Government points out that the agents explicitly informed the Defendant that he was not under arrest, and there is no evidence that the agents used coercive police procedures, such

---

[3] The Court considers the facts in this paragraph although they were obviously unknown to the agents. Such facts are still useful to gauge the credibility of the agents' statements regarding the Defendant's demeanor at the time of the interview or what was reasonably apparent to the agents when they obtained the consent. *See United States v. Grap*, 403 F.3d 439, 445 (7th Cir. 2005).

5

as pressure or deception. The Government also argues that the extent and immediacy of the Defendant's willingness to cooperate with the agents favors a finding that his consent was given freely and voluntarily. [4]

Although the Fourth Amendment prohibits law enforcement officers from searching property without a warrant or probable cause, they may do so if they obtain voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Voluntary consent is the product of an "essentially free and unconstrained choice." *Id.* at 225. The assessment of voluntariness is fact-intensive and depends upon the totality of the circumstances. *Id.* at 248-49. The Government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984) (noting that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

In this inquiry, the Court may consider such factors as: the presence of coercive police procedures; the extent of the defendant's cooperation; the defendant's awareness of his right to refuse consent; the defendant's education and intelligence; and the defendant's belief that no incriminating evidence will be found in the search. *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001). Courts also consider the mental health and capability of the person giving consent. *See, e.g.*, *United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005); *United States v. Elrod*, 441 F.2d 353, 355-56

---

[4] In this case, the Government and the Defendant focused their briefing, arguments, and evidence on the issue of voluntary consent, which was relevant to both the searches and the statements made by the Defendant during the interview. As discussed in *Barbour*, there is an additional analysis relevant to the suppression of the statements, namely whether the Defendant knowingly and intelligently waived his *Miranda* rights. This latter issue was not raised by the Defendant and is not considered in this Order.

(5th Cir. 1971). While a defendant's mental condition may be a "significant" factor in the voluntariness calculus, this "does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' " *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).[5]

In this case, the Defendant's arguments turn on his mental illness coupled with the circumstances of his interview. These arguments are similar to those raised by the defendant in *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir 1995). In *Barbour*, the defendant, who had made certain threats against the President, was interviewed by agents in his psychiatrist's office. *Id.* at 583. The agents learned during the interview that the defendant had received treatment after attempting suicide and told him that they could help him receive mental health treatment. *Id.* Immediately following the interview, the defendant met with his psychiatrist, who found him to be suicidal and involuntarily committed him to a mental health facility. *Id.* at 584. The next day, while confined at the facility, the agents returned and obtained the defendant's consent to search his apartment and car. *Id.*

The defendant was arrested and moved to suppress the evidence obtained as the result of the searches and the admissions made during the interview. *Id.* The defendant argued that, given his severe mental depression and medicated state, the agents' statement that they could help him obtain mental health treatment was coercive. *Id.* at 585. The district court found that the agents' statement was not coercive and there was no evidence that the defendant's mental illness interfered with his ability to think

---

[5] For the reasons found in *United States v. Jennings*, 491 F. Supp. 2d 1072, 1078-80 (M.D. Ala. 2007), this Court concludes that the Eleventh Circuit implicitly applied the coercion requirement from *Connelly* in a consent to search case.

7

clearly and understand the request. *Id.* at 584. Thus, the district court concluded that the government met its burden of proving by a preponderance of the evidence that the defendant voluntarily made certain admissions and consented to the search of his apartment and car. *Id.*

The Eleventh Circuit affirmed the district court and, in doing so, discussed how a defendant's mental disability should be weighed in the voluntariness inquiry. *Id.* at 585-86. The Eleventh Circuit noted that the "fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary . . . ." *Id.* at 585. Rather, there must be coercion by an official actor, which is to say, the law enforcement officer must take advantage of the defendant's mental infirmity. *Id.* The Court reasoned that the agents' offer to help the defendant obtain treatment was not coercive. *Id.*

In this case, unlike in *Barbour*, there is nothing to suggest that the agents attempted to persuade or influence the Defendant so as to induce him to consent to the search. The agents did not promise the Defendant treatment, as in *Barbour*. They were courteous, professional, and non-threatening. There is no evidence that the agents took advantage of the Defendant's condition.

Further, although the agents were aware of the Defendant's mental illness, either just prior to or during the interview, they clearly satisfied themselves that the Defendant was lucid. During the interview, the agents questioned the Defendant to determine if he was receiving treatment, if he was hearing voices during the interview itself and the last time he heard voices. Put simply, the agents satisfied themselves that the Defendant was not suffering symptoms, was aware of his surroundings, and was answering their questions in an appropriate manner. This is what the Court would expect a reasonable officer to do once the officer became aware that a defendant may have a mental illness.

Other factors also weigh in favor of a finding that the consent to search was freely given. The Defendant was advised of his right to refuse consent. He was provided a written consent to search form, which he signed. His age and level of education suggest that he had the capacity to read and understand the consent to search form prior to signing it. The extent of the Defendant's cooperation also tends to show that the consent was voluntary, even taking into account the fact that he may have been predisposed to comply with requests from adults.[6]

The factors that weigh in favor of a finding that the consent was not voluntary have been identified by the Defendant. There was the closed door during the interview, and the agents' desire to interview the Defendant alone in the face of multiple requests that his mother be present during the interview. However, absent some showing of coercion, the Court is not disposed to find the agents' refusal to permit a thirty-four-year-old man to have his mother present during his interview so unreasonable as to vitiate consent.

Indeed, what is ultimately determinative in the analysis of whether, in the totality of circumstances, the consent was voluntary is if the agents' conclusions of voluntariness were reasonable in light of the Defendant's behavior, as presented to the officers. *See United States v. Grap*, 403 F.3d 439, 444-45 (7th Cir. 2005). Such conclusions were reasonable in this case.

---

[6] The Court has located only one reported case in which a court has credited a similar argument. *See State v. Tye*, 580 S.E.2d 528, 530-31 (Ga. 2003). In that case, the trial court suppressed certain evidence because, in part, it found the defendant perceived "that he was compelled to accede to the investigator's request" to turn the evidence over. There is nothing in this case suggesting that the Defendant felt he was compelled to consent to the search of the computer. Furthermore, there is no evidence that the agents knew the Defendant was predisposed to comply with their requests or, even if they did, that they took advantage of this predisposition.

The Court therefore finds, after weighing these circumstances, that the Government has shown that the Defendant's consent was freely and voluntarily given, by the greater weight of the evidence.

## CONCLUSION

In view of the above, the Defendant's Motion to Suppress Evidence (Doc. No. 39) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 28, 2012.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record